Citation Nr: 1722266 
Decision Date: 06/15/17 Archive Date: 06/29/17

DOCKET NO. 11-05 300 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Detroit, Michigan


THE ISSUES

1. Entitlement to service connection for bilateral hearing loss.

2. Entitlement to service connection for residuals of jungle rot.

3. Entitlement to service connection for costochondritis claimed as chest pain, including as secondary to service-connected anxiety.

4. Entitlement to service connection for hypertension, including as secondary to service-connected anxiety.

5. Entitlement to an initial rating for generalized anxiety disorder in excess of 30 percent.

6. Entitlement to a total disability evaluation based on individual unemployability (TDIU).


REPRESENTATION

Appellant represented by: Veterans of Foreign Wars of the United States


WITNESS AT HEARING ON APPEAL

The Veteran and his wife


ATTORNEY FOR THE BOARD

P. Saindon, Associate Counsel


INTRODUCTION

The Veteran served on active duty in the United States Army from March 1970 to March 1972.

This matter comes before the Board of Veterans' Appeals (Board) from May 2010, August 2010, March 2014, and April 2014 rating decisions of the Department of Veterans Appeals (VA) Regional Office (RO) in Detroit, Michigan.

The Veteran and his wife testified before the undersigned Veterans Law Judge in a March 2017 video conference Board hearing. A copy of the transcript is of record.

This matter was remanded by the Board in March 2016 in order to obtain a video conference hearing. It has now returned for adjudication.

The issue(s) of entitlement to an initial rating in excess of 30 percent for generalized anxiety disorder and entitlement to TDIU are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction.


FINDINGS OF FACT

1. The Veteran's bilateral hearing loss was not incurred in or caused by active service; did not present to a compensable degree within one year of service; and did not present continuous symptoms since active service.

2. Prior to the promulgation of a final decision by the Board, the Veteran indicated on the record that he wished to withdraw his claim for residuals of jungle rot.

3. The Veteran's chest pain is a symptom of his anxiety and not attributable to a separately diagnosed condition including costochondritis.

4. The Veteran does not have and has not had diastolic blood pressure is predominately 90mm or greater, or systolic blood pressure is predominantly 160mm or greater with a diastolic blood pressure of less than 90mm confirmed by readings taken two or more times on at least three different days.


CONCLUSIONS OF LAW

1. The criteria for service connection for bilateral hearing loss have not been met. 38 U.S.C.A. §§ 1110, 1112, 1113, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.310 (2016).

2. The criteria for withdrawal of a substantive appeal on the issue of service connection for residuals of jungle rot have been met and the appeal is withdrawn. 38 U.S.C.A. § 7105 (West 2014); 38 C.F.R. §§ 20.204 (2016).

3. The criteria for service connection for costochondritis or chest pain as a separately ratable condition have not been met. 38 U.S.C.A. §§ 1110, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.310 (2016).

4. The criteria for service connection for hypertension have not been met. 38 U.S.C.A. §§ 1110, 1112, 1113, 1131, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.310, 4.104, Diagnostic Code 7101 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Board has thoroughly reviewed all the evidence in the Veteran's claims file. Although the Board has an obligation to provide the reasons and bases supporting this decision, there is no need to discuss, in detail, all the evidence submitted by the Veteran or on his behalf. Gonzales v. West, 218 F.3d 1378, 1381 (Fed. Cir. 2000). The analysis below focuses on the most salient and relevant evidence and on what this evidence shows, or fails to show, on the claim.

The Board must consider the competency, credibility, and weight of all evidence, including the medical evidence, to determine its probative value. The Board must then account for evidence that it finds persuasive or unpersuasive, and provide reasons for rejecting any evidence favorable to the claimant. Timberlake v. Gober, 14 Vet. App. 122, 129 (2000). Equal weight is not accorded to each piece of evidence contained in the record and every item of evidence does not have the same probative value. If the evidence weighs in favor of the Veteran or is in relative equipoise, the Veteran will prevail. On the other hand, if the preponderance of the evidence is against the Veteran, the claim is denied. Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

I. Withdrawn Appeal

Under 38 U.S.C.A. § 7105, the Board may dismiss any appeal which fails to allege specific error of fact or law in the determination being appealed. A substantive appeal may be withdrawn in writing or on the record at a hearing at any time before the Board promulgates a decision. 38 C.F.R. § 20.204.

The Veteran indicated at the March 2017 hearing that he wished to withdraw his claim for service connection for the residuals of jungle rot. Thus, there remain no allegations of error of fact or law for appellate considerations on this issue. The Board does not have jurisdiction to review the claim of entitlement to service connection for residuals of jungle rot and they are dismissed.

II. Duties to Assist and Notify

VA has duties to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5103, 5103A; 38 C.F.R. § 3.159.

The duty to notify has been met. See April 2009 and July 2009 VA correspondence. Neither the Veteran nor his representative has alleged prejudice with regard to notice. The United States Court of Appeals for the Federal Circuit has held that "absent extraordinary circumstances . . . it is appropriate for the Board . . . to address only those procedural arguments specifically raised by the veteran . . . ." Scott v. McDonald, 789 F.3d 1375, 1381 (Fed. Cir. 2015). In light of the foregoing, nothing more is required.

VA also has a duty to assist the veteran in obtaining evidence necessary to substantiate a claim. 38 U.S.C.A. § 5103A(a) ("The Secretary shall make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the . . . claim"). This duty includes assisting the veteran in obtaining records and providing medical examinations or obtaining medical opinions when such are necessary to make a decision on the claim. 38 U.S.C.A. § 5103A(b), (c), & (d).

The Veteran's relevant service and post-service medical records have been obtained and associated with the claims file. The Veteran has not indicated that there is any outstanding evidence to submit.

The Veteran underwent VA examinations on March 2010, July 2010 and February 2014. The VA examiners reviewed the service treatment records, reviewed the post service medical history, examined the Veteran, considered his complaints, provided a detailed report of his symptoms, and provided etiological opinions. The collective examinations are deemed adequate for adjudication purposes. Barr v. Nicholson, 21 Vet. App. 303, 311 (2007); Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007).

The Veteran was not afforded a separate VA examination for costochondritis or chest pain. However, the VA examiner in February 2014 addressed costochondritis together with hypertension. In addition, the Veteran had records from numerous private medical examinations that searched for the cause of his chest pain and multiple opinions that opined that his chest pains related to his anxiety. Accordingly, there is sufficient competent medical evidence on file for VA to make a decision and a remand for a separate examination is not necessary. See McLendon v. Nicholson, 20 Vet. App. 79, 81 (2006). 

The Board previously remanded this case in March 2016 in order to provide the Veteran with a videoconference hearing. The Veteran was scheduled for and attended a hearing in March 2017. The Board is satisfied that its remand directive has been substantially complied with. See Stegall v. West, 11 Vet. App. 268, 271 (1998).

Based on the foregoing, the Board finds that VA fulfilled its duties to notify and assist the Veteran in the evidentiary development of the claim decided herein, and no additional assistance or notification is required. Having been provided with adequate opportunity to submit or otherwise identify relevant evidence in support of his claims, the record does not need to be held open any longer, and no further delay in the adjudication of this appeal is warranted. The Veteran has suffered no prejudice that would warrant a remand and his procedural rights have not been abridged. In addition, the Veteran has not argued that any procedural defects have occurred. See Scott, 789 F.3d at 1381. The Board will therefore proceed with the adjudication of this appeal.

III. Service Connection

Under the relevant laws and regulations, service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C.A. § 1110. Generally, the evidence must show: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004); Caluza v. Brown, 7 Vet. App. 498, 505 (1995). Regulations also provide that service connection may be granted for a disability diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disability is due to disease or injury which was incurred in or aggravated by service. 38 C.F.R. § 3.303(d). 

Certain chronic diseases, such as hypertension and organic conditions of the nervous system (including sensorineural hearing loss), are subject to presumptive service connection if manifest to a compensable degree within one year from separation from service even though there is no evidence of such disease during the period of service. This presumption is rebuttable by affirmative evidence to the contrary. 38 U.S.C.A. §§ 1112, 1113; 38 C.F.R. §§ 3.307(a)(3), 3.309(a). 

An alternative method of establishing the second and third Shedden elements for disabilities identified as chronic diseases in 38 C.F.R. § 3.309(a) is through a demonstration of continuity of symptomatology. 38 C.F.R. § 3.303(b). Continuity of symptomatology may be shown if "the condition is observed during service or any applicable presumption period, continuity of symptomatology is demonstrated thereafter, and competent evidence relates the present condition to that symptomatology." Savage v. Gober, 10 Vet. App. 488, 498 (1997).

Service connection may also be granted for a disability that is proximately due to or the result of a service-connected disability. 38 C.F.R. § 3.310(a). Furthermore, service connection may be established on a secondary basis for a disability which is aggravated by a service-connected disability. Allen v. Brown, 7 Vet. App. 439, 448 (1995) (en banc).

"Congress specifically limits entitlement for service-connected disease or injury to cases where such incidents have resulted in a disability. . . . In the absence of proof of a present disability there can be no valid claim." Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992); see also Begmetich v. Brown, 104 F.3d 1328, 1332 (Fed. Cir. 1997).

If there is at least an approximate balance of positive and negative evidence regarding any issue material to the claim, the Veteran shall be given the benefit of the doubt in resolving each such issue. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102.

A. Bilateral Hearing Loss

Service treatment records indicated that the Veteran's hearing was normal at entry and discharge. There was also no documentation of complaints, treatment, or diagnosis of hearing loss in service. As will be noted below, the Veteran does not argue the contrary.

The Veteran was afforded a VA examination in March 2010. Hearing loss for VA purposes was identified. The examiner first noted that the enlistment audiometric examination and the separation audiometric examination did not reveal a threshold shift in hearing. The examiner opined that the Veteran's bilateral hearing loss was less likely than not due to his military service because the Veteran's hearing did not undergo a characteristic threshold shift during service despite the incurrence of tinnitus. 

The Veteran was examined by a private audiologist in March 2011. The private audiologist reported that the Veteran reported being exposed to noise from weapons fire without hearing protection. The Veteran also reported being exposed to loud noise post-service, but the Veteran stated that he was always wearing hearing protection when exposed to the later noise. The private audiologist diagnosed the veteran with moderate-severe predominantly sensorineural high-frequency hearing loss bilaterally. The audiologist opined that it was more likely than not that the Veteran's current hearing loss was caused or aggravated by excessive firearm noise exposure he incurred while serving in the United States military. The audiologist did not provide a rationale for his opinion and did not consider the Veteran's prior audiological testing. 

In March 2017 the Veteran testified that he noticed a change in his hearing after he got out of service. The Veteran's wife testified that it may have been ten years after service that she noticed his hearing declining.

The Veteran has been diagnosed with sensorineural hearing loss in both ears. This diagnosis satisfies Shedden element (1).

The Veteran testified that he was exposed to noise in service. This noise exposure is credited and could be an in-service injury. Shedden element (2) is satisfied.

The evidence weighs against a finding for Shedden element (3), the nexus requirement, however. As stated above, the Veteran had no shift in hearing between entry and exit from the military. The VA examiner relied upon this information as part of his opinion that the Veteran's hearing loss was not service related. The Veteran also testified that his hearing decreased only after service, and the Veteran's wife testified that his hearing loss began approximately ten years after service. These facts all weigh against nexus.

The private audiologist opined that the Veteran's hearing loss was service connected. However, the private audiologist did not provide reasons for that opinion. This limits the opinion's weight. See Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007) (holding that a practitioner "must support its conclusion with an analysis that the Board can consider and weigh against contrary opinions."). In addition, the private audiologist reported a history of bilateral hearing loss, but did not consider previous audiological reports, including those before and after service. Without this information, and without a rationale for his opinion, it is not clear what facts the audiologist assumed in reaching his conclusion and whether those assumptions were accurate. See Reonal v. Brown, 5 Vet. App. 458, 461 (1993) ("An opinion based upon an inaccurate factual premise has no probative value."). The VA examiner's opinion is weighed more heavily than the private medical examiner as a result.

The Veteran has strenuously emphasized that his only exposure to loud noise without hearing protection was in the military, and that his hearing loss must, therefore, have been from that exposure. Although there is certain logic to the Veteran's argument, medical etiology is not subject to lay deduction. The Veteran is not a medical professional with experience in diagnosing the etiology of hearing loss. The VA and private audiologists were, and their opinions are weighed more heavily, as discussed above. The Veteran's opinion does not change the weight of the evidence, which is against a finding of nexus.

The Veteran's hearing loss also did not have its onset within one year of his active service. The testimony of record supports this conclusion. Accordingly, presumptive service connection and service connection under continuity of symptomatology do not apply.

At the hearing, the Veteran's representative discussed the age of the VA examination. The "mere passage of time," however, does not render an old examination inadequate. Palczewski v. Nicholson, 21 Vet. App. 174, 182 (2007). The issue here is nexus. A more recent examination would not provide additional insight into the nexus between service and the Veteran's hearing loss and the "passage of time" does not render the previous examination inadequate. 

As the weight of the evidence is against the Veteran's claim, the benefit-of-the-doubt doctrine does not apply. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 53. Service connection for bilateral hearing loss must therefore be denied.

B. Costochondritis (Chest Pain)

The Veteran's service treatment records indicate that he was treated for chest pain in February 1971. At the time, the Veteran also complained of palpitation with difficulty breathing. The provider noted two possible impressions: costochondritis or heart and "ASA" (presumably atrial septal aneurysm). 

In August 1979, the Veteran's doctor, SJC, reported that the Veteran had chronic recurrent upper GI and chest symptomatology, but that all x-rays, EKGs and labs were normal. The doctor diagnosed the problem as anxiety, possibly as the residual effect of LSD taken while in service. Records attached by Dr. SJC indicated complaints of chest pain going back to 1972.

In a medical record dated March 1994, the Veteran reported chest pain. The medical provider wrote that the Veteran should not be having GI problems and that the pain was atypical for heart disease. The provider stated that "I suspect this is anxiety related." The Veteran was then evaluated by fluoroscope, which revealed normal upper gastrointestinal examination. A stress test performed the same month returned negative for problems. 

Private medical records from January 1998 noted complaints of chest pain and a diagnosis of panic attacks. A stress test was performed the same month, noting mostly normal results and that the chest pain was not compatible with angina. The examining physician did note a higher risk factor for coronary artery disease.

Private medical records from June 2000 noted a complaint of chest pain, which the doctor described as "atypical." The Veteran underwent another stress test in August 2000, which returned normal.

In September 2003, the Veteran underwent another stress test due to chest pain, which was considered "negative."

Private medical records reported a visit for chest pain in February 2006, which was again described as atypical.

Private medical records reported a visit in April 2008 for chest pain "from his anxiety." The Veteran underwent another stress test, which returned negative. The stress test reported that an "atypical chest discomfort is described but is not associated with ischemic character ST - T wave alterations."

In a March 2010 letter, the Veteran's physician from 1972 to 1998, SJC, stated that he treated the Veteran "for anxiety with chest pain plus panic attacks all due to his military service." 

In a July 2012 psychosocial assessment, the evaluator reported that the Veteran suffered from recurrent chest pain. 

In a July 2012 letter from the Veteran's doctor, WJD, the doctor stated that the Veteran had high blood pressure and chest pain with anxiety.

The Veteran received treatment at MMC. In April 2013, the Veteran presented with fatigue and chest pain or pressure. The provider noted that the reported symptom started in service. The provider also mentioned the Veteran's anxiety had worsened. 

The Veteran had chest x-rays taken in May 2013. The radiologist reported that his cardiovascular structures and mediastinum appeared normal and stabled. The radiologist opined that the Veteran had no acute disease. 

The Veteran also underwent an echocardiogram in May 2013. The reported reason for this test was chest pressure. The doctor opined that the Veteran's echocardiogram was "abnormal" and that the abnormalities "may be related to coronary disease in the territory of the LAD and right coronary artery." The same month, the Veteran underwent a heart catheterization, coronary angiography and left ventriculography with intracoronary stent placement. The Veteran then underwent another chest x-ray that came back negative. In a follow up visit, the Veteran stated that he continued to have chest pain, but it was different from the pain prior to his catheterization. The Veteran followed up again in June 2013, and reported that his chest pain subsided with a change in medication. 

The Veteran was seen again in September 2013 presenting with dizziness, hypertension and gastroesophageal reflux. The provider noted that the Veteran complained of chest pain or pressure, which the provider attributed to reflux. The Veteran had another chest x-ray, which indicated "no active process seen." 

In November 2013, the Veteran visited the hospital with chest pain that had been affecting him for the previous ten days. The Veteran had his medication changed to try to relieve symptoms. The Veteran was admitted to the MMC hospital later that month with chest pain. The Veteran reported having a history of chest pain, and that prior to May 2013, testing had been negative for any issue. His chest pain was described as atypical. The Veteran underwent a catheterization and the doctors observed normal left ventricular systolic function and non-obstructive coronary artery disease previously treated with stents. A follow up appointment in December 2013 concluded with "not his heart."

The doctor from MMC wrote to the Veteran's primary care provider in January 2014. The doctor noted that the Veteran continued to have chest pain despite the treatment for his heart. The doctor further noted that the Veteran had a recent endoscopy, which did not find anything significant. The doctor concluded "chest pain, unclear of the etiology." At a visit with the MMC doctor later that month, the Veteran reported continued chest pain.

In February 2014, the Veteran was afforded a VA examination for hypertension. As part of the hypertension report, the examiner noted that the Veteran did not have any signs or symptoms of costochondritis.

In a March 2014 letter, the Veteran's physician, WJG, stated that since "September 2013 his anxiety has progressively gotten worse and causes him to have chest pain and hypertension." 

The Veteran undoubtedly has a long history of chest pain. However, "pain alone, without a diagnosed or identifiable underlying malady or condition, does not in and of itself constitute a disability for which service connection may be granted." Sanchez-Benitez v. West, 13 Vet. App. 282, 285 (1999) aff'd 259 F.3d 1356 (Fed. Cir. 2001) (affirming on other grounds without addressing pain alone). As chest pain is not a disability, it cannot by itself be service connected. Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992) ("In the absence of proof of a present disability there can be no valid claim."); see also Begmetich v. Brown, 104 F.3d 1328, 1332 (Fed. Cir. 1997). 

However, the Veteran is service connected for generalized anxiety disorder. Multiple doctors have also opined that the Veteran's chest pain was caused by, or a symptom of, his anxiety. As a symptom of the Veteran's anxiety, however, his chest pains should be incorporated into and considered as part of his rating for anxiety. It should not be a standalone disability secondary to his anxiety, because as discussed above, chest pain by itself is not itself a disability.

The Veteran has also been extensively tested for other possible disabilities that could cause chest pains. Doctors have repeatedly opined that the pains did not have a cardiac or gastrointestinal origin. The Veteran himself has attributed the chest pain to his anxiety disorder. The RO categorized the Veteran's chest pain as costochondritis as his service treatment records suggest that may have been one possibility, but that condition was not definitively diagnosed in service and several decades of doctors have rejected this diagnosis. 

As the weight of the evidence is against the Veteran having a disability of the chest, the benefit-of-the-doubt doctrine does not apply. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 53. Service connection for costochondritis and chest pain must therefore be denied.

Chest pain as a symptom of anxiety, however, should still be addressed on remand as part of a further anxiety evaluation.

C. Hypertension

For VA disability purposes, "the term hypertension means that the diastolic blood pressure is predominately 90mm or greater, and isolated systolic hypertension means that the systolic blood pressure is predominantly 160mm or greater with a diastolic blood pressure of less than 90mm." 38 C.F.R. § 4.104, Diagnostic Code 7101 Note (1). In addition, hypertension or isolated systolic hypertension "must be confirmed by readings taken two or more times on at least three different days." Id.

The Veteran's service treatment records did not mention high blood pressure or treatment for high blood pressure.

A March 1994 treatment note noted a blood pressure reading of 130/80.

A 2008 article submitted by the Veteran concluded that posttraumatic stress disorder is associated with greater rates of hypertension compared with depression or no mental illness. 

A July 2009 treatment note noted blood pressure of 128/80.

In a March 2010 letter from the Veteran's doctor from 1972-1998, the doctor reported that the Veteran had a number of problems, but did not include hypertension as a problem.

In a September 2010 article submitted by the Veteran, posttraumatic stress disorder was related to hypertension, obesity, and other physical ailments.

In a July 2012 letter from the Veteran's doctor, WJD, the doctor stated that the Veteran had high blood pressure and chest pain with anxiety. Dr. WJD attributed the Veteran's need for blood pressure medication to his recurrent chest pain.

A March 2013 article on coronary heart disease submitted by the Veteran concluded that anxiety was associated with an increased risk of mortality in coronary heart disease patients, particularly when comorbid with depression.

In February 2014, the Veteran was afforded a VA examination. The Veteran reported that he believed he was first diagnosed with hypertension in the late 1980s to early 1990s. The Veteran also reported developing ischemic heart disease in 2013. The examiner reported that the Veteran did not have a history of diastolic blood pressure elevation above 100 or more. The examiner reported blood pressures of 145/77, 135/81, and 127/68. The examiner opined that the Veteran's hypertension was not related to service based upon the service treatment records and the Veteran's statement that his hypertension did not onset until long after active duty. The examiner also concluded that the Veteran's hypertension was not related to his anxiety disorder as the examiner's review of the medical literature did not support the Veteran's claim. The examiner further opined that the Veteran's anxiety did not aggravate the Veteran's hypertension and noted the Veteran had a history of smoking which itself could cause hypertension.

In an April 2014 letter from the Veteran's doctor, WJD, the doctor reported that the Veteran's anxiety caused him to have hypertension. 

Although the Veteran has been diagnosed with hypertension by various medical professionals, as described above, hypertension for VA purposes requires more. The Veteran's diastolic blood pressure has been predominantly less than 90mm and his systolic blood pressure has been predominantly less than 160mm. Even for the very few incidents over the last few decades that included a reading at 90mm, those readings were not repeated. The predominate readings were less to much less than the VA required amount. It is important to note that the Veteran's personal physician even indicated that the Veteran's use of blood pressure medication was to help relieve his symptom of chest pain as opposed to treating hypertension. As the Veteran does not have, and did not have a history of blood pressure readings in excess of the regulatory amount, service connection for hypertension must be denied.

The Board acknowledges that the requirement of a current disability is satisfied when the Veteran has a disability at the time a claim for VA disability compensation is filed or during the pendency of that claim and that the claimant may be granted service connection even though the disability resolves prior to the Secretary's adjudication of the claim. McClain v. Nicholson, 21 Vet. App. 319, 321 (2007). However, the facts of the present case are distinguished from those of McClain. The evidence does not reflect that the Veteran had hypertension that resolved during the pendency of the claim. Rather, as discussed, the Board finds that the most probative evidence (i.e. the medical records) indicates that the Veteran did not have hypertension for VA purposes at any point during the appeal period or prior to his filling a claim for service connection. See Romanowsky v. Shinseki, 26 Vet. App. 289, 294 (2013).

For the sake of being thorough and complete, the Board also finds that service connection for hypertension would be denied, even if a diagnosis for VA purposes was established, based on the finding that the medical evidence of record weighs against there being a nexus between service or a service connected disability and hypertension. Specifically, the opinion provided by the VA examiner in February 2014 is detailed and provides clear rationale for its negative conclusion. The examiner even indicated that a search of medical literature failed to establish a relationship by causation or aggravation between anxiety and hypertension. He identified the Veteran's history of smoking as the most likely cause of his hypertension. The examiner also highlighted that hypertension was not diagnosed until many years after service discharge. 

By contrast, the positive opinions from Dr. WJD are conclusory and provide no supporting rationale. The literature provided by the Veteran also carries diminished value as they fail to address the nature and etiology of the Veteran's hypertension. Such generic evidence, without a supplemental opinion from a medical professional, lacks the degree of certainty that would heighten its probative value. See Wallin v. West, 11 Vet. App. 509 (1998) (noting that medical literature or treatises can provide important support when combined with an opinion of a medical professional if the article or treatise evidence discusses generic relationships with a degree of certainty such that, under the facts of a specific case, there is at least plausible causality based upon objective facts rather than on an unsubstantiated lay medical opinion). 

Service connection under presumptive, continuity of symptomatology, and direct theories would also fail. The Board again notes that the first evidence of hypertension is not seen until many years after service. The Veteran has not argued the contrary.

As the weight of the evidence is against the Veteran's claim, the benefit-of-the-doubt doctrine does not apply. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 53. Service connection for hypertension must therefore be denied.


ORDER

Entitlement to service connection for bilateral hearing loss is denied.

The appeal for service connection for residuals of jungle rot is dismissed.

Entitlement to service connection for costochondritis claimed as chest pain, including as secondary to service-connected anxiety is denied.

Entitlement to service connection for hypertension, including as due to service-connected anxiety is denied.


REMAND

The Veteran was last afforded a VA examination for anxiety in February 2014. At the March 2017 hearing, the Veteran testified that his anxiety had worsened since that time. The Veteran and his wife also reported suicidal ideation in statements made after the last examination that were not considered by the last examiner. The last examiner also did not discuss the Veteran's reported panic attacks and chest pain attributable to anxiety. Accordingly, a new examination to determine the severity of the Veteran's anxiety is required.

In addition, the issue of TDIU must also be remanded. The Veteran currently does not meet the schedular requirements for TDIU as he is currently only rated at a combined 40 percent (30 percent for anxiety and 10 percent for tinnitus). This amount may change after the RO reconsiders the Veteran's anxiety rating. Even if it does not, however, referral is warranted for consideration of extraschedular TDIU. 

Although the Veteran reported working previously, his employment was provided by close family members. Marginal employment, determined on a facts found basis, does not preclude an award of TDIU. Marginal employment may include work done in a protected environment such as work in a family business. See 38 C.F.R. § 4.16. The February 2014 examiner stated that the Veteran could only work because his brothers provided him the freedom to work or not work based upon his perception of his symptoms. The examiner opined that the Veteran would not be able to work for people other than his brothers due to the Veteran's anxiety. Thus it appears that a finding of marginal employment may be appropriate and extraschedular TDIU should be considered. 

The Board, however, cannot assign an extraschedular rating in the first instance. Bowling v. Principi, 15 Vet. App. 1, 10 (2001). Instead, "rating boards should submit to the Director, Compensation Service, for extra-schedular consideration all cases of veterans who are unemployable by reason of service-connected disabilities." 38 C.F.R. § 4.16(b).

Accordingly, the case is REMANDED for the following action:

1. Schedule the Veteran for an examination with an appropriate medical professional to evaluate the severity of his generalized anxiety disorder. Forward the Veteran's claims folder, including a copy of this remand, to the examiner. 

Although the entire claims folder should be reviewed, the examiner should pay particular attention to the Veteran's March 2017 testimony that his symptoms have worsened and the June 2012 statements from the Veteran and his wife that the Veteran has recurrent suicidal ideation. 

The examiner should describe the symptoms of anxiety that the Veteran experiences and describe the functional occupational and social effects of those symptoms. The examiner should address specifically the Veteran's chest pain as a symptom of anxiety. If the examiner finds that the Veteran suffers from panic attacks, the frequency and severity of the panic attacks should be described.

2. After completion of (1), and unless TDIU is otherwise granted, refer the Veteran's case to the Director, Compensation Service, for extraschedular consideration of TDIU.

3. After completing the above actions, readjudicate the claim. If the claim remains denied, a supplemental statement of the case should be provided to the Veteran and his representative. After they have had an adequate opportunity to respond, the case should be returned to the Board for further review.

The appellant has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



______________________________________________
MICHAEL A. HERMAN
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs